[No. B124192. Second Dist., Div. Three. Feb. 7, 2000.]

SAM OSTAYAN, Plaintiff and Appellant, v.
SERRANO RECONVEYANCE COMPANY et al., Defendants and
Respondents.

## COUNSEL

Gregory S. Silver and Richard C. Brizendine for Plaintiff and Appellant.

Luce, Forward, Hamilton & Scripps and Charles A. Bird for Defendants and Respondents.

## OPINION

**CROSKEY, Acting P. J.**—In this action against defendants and respondents Home Savings of America F.S.B. (Home) and Serrano Reconveyance Company (Serrano), the plaintiff and appellant, Sam Ostayan, seeks reversal of a summary judgment entered against him on his seven-count first amended complaint. Claiming that he had been misled into purchasing a parcel of income property at a trust deed foreclosure sale conducted by Serrano on behalf of Home, Ostayan sought to undo the transaction or, in the alternative, recover damages. He argued that the manner in which Serrano had noticed and conducted the sale constituted a misrepresentation and nondisclosure upon which he had relied in making his successful foreclosure bid; in addition, he argued that Home's trust deed upon which the foreclosure was held had merged with another senior lien also owned by Home. Thus, Ostayan claimed that he had acquired all of the legal and equitable interests under both trust deeds. The trial court rejected these arguments and concluded that, under the undisputed facts, there was no legal basis for Ostayan's claims and the trustee's sale was valid; the court also held that neither Home nor Serrano was liable for damages.

For the reasons set out below, we concur with the conclusion of the trial court and we therefore affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

In 1983, Home loaned $230,000 to P.K. and Clara Kurian (the Kurians) to enable them to conclude the purchase of a 10-unit apartment building located at 7044 Jodan Avenue in Canoga Park, California (the property). The Kurians executed a note in that amount as well as a deed of trust to secure repayment (the 1983 trust deed). This trust deed, which became a first lien

---

[1]The facts which we recite are those which appear to be undisputed in the record and/or are taken directly from declarations filed herein by Ostayan.

on the property, was recorded as instrument No. 83-849980 on July 26, 1983, with Serrano as the trustee.[2]

In 1988, Home loaned an additional $110,000 to the Kurians who executed a note in that amount together with a deed of trust securing its payment. Again, Serrano was the named trustee. This trust deed, which was entitled "Additional Advance Deed of Trust," and recorded as instrument No. 88-113619 on January 27, 1988 (the 1988 trust deed), provided, in part: "Trustor [i.e. the Kurians] is obligated on a loan held by [Home] . . . which loan is secured by a deed of trust on [the property], which deed of trust was recorded describing the property on July 26, 1983 . . . . [¶] Trustor now has requested that [Home] make an additional loan, which [Home] is willing to make, *subject to Trustor's execution and delivery of this Additional Advance Deed of Trust.*" (Italics added.)

In 1997, the Kurians became delinquent on their payment under these two obligations.[3] On March 28, 1997, Serrano, as trustee, recorded a notice of default and election to sell the property in foreclosure. That notice expressly provided that the sale would be made to satisfy the obligation secured by the "Deed of Trust executed by [the Kurians], as trustor, *recorded on 01/27/88, as Instrument No. 88-113619.* . . . The total amount secured by said instrument as of the time of the publication of this notice is $115,655.20, . . ." (Italics added.) The notice set the sale for July 28, 1997.

Ostayan, in due course, obtained a copy of this notice and immediately ordered copies of the two deeds of trust described above, as well as a

---

[2]The security section of this first trust deed provided that it was executed for the purpose of securing: "(1) payment of the sum of $230,000.00 with interest thereon, according to the terms of a promissory note of even date herewith made by Trustor, payable to Beneficiary or order and all modifications, extensions or renewals thereof."

In addition, the security section of, the trust deed contained two so-called dragnet clauses, which provided that the trust deed also secured: "*(2) Payment of such additional sums with interest thereon (a) as may be hereafter borrowed from Beneficiary by the then record owner of such property and evidenced by a promissory note or notes reciting it or they are so secured and all modifications, extensions or renewals thereof or (b) as may be incurred, paid out, or advanced by Beneficiary, or may otherwise be due to Trustee or Beneficiary, under any provision of this Deed of Trust and all modifications, extensions or renewals thereof. . . . (7) At Beneficiary's option, payment, with interest thereon, of any other present or future indebtedness or obligation of Trustor* (or any successor in interest of Trustor to such property) due to Beneficiary, whether created directly or acquired by absolute or contingent assignment, whether due or not, whether otherwise secured or not, or whether existing at the time of the execution of this Deed of Trust or arising thereafter, *the exercise of such option to be evidenced by a notice in writing to Trustor or any successor in interest to Trustor.*" (Italics added.)

[3]Although the Kurians had executed separate notes for these two loans, Home apparently combined the scheduled payments and, using the same loan number for both loans, sent the Kurians a single billing statement each month reflecting a single amount due.

preliminary report of title from Lawyers Title Company. That report, which was dated as of July 25, 1997, described instrument No. 88-113619 as *disclosing* an "additional advance secured by" the original deed of trust recorded on July 26, 1983, as instrument No. 83-849980. In short, this title report (for which neither Home nor Serrano was responsible) indicated that the 1988 advance of $110,000 was secured by the original 1983 trust deed.[4]

Apparently believing that the 1988 trust deed was not in fact a separate deed of trust securing a new and different loan but rather was simply an extension of the original deed of trust to secure an additional advance made on the original loan,[5] *and relying on that belief and the title report from Lawyers Title Company*, Ostayan went to the trustee's sale on July 28, 1997.

At the time of the sale, the auctioneer, at the instruction of Home and Serrano, announced *twice* to all persons present: "We believe there is a senior lien outstanding on this property in an estimated amount of $298,301.11 plus accrued interest, fees and costs. This lien is believed to have priority over the subject lien being foreclosed upon."[6] Prior to the reading of this statement it appeared that approximately 10 people were interested in bidding on the property. After the reading, all but three turned away and did not participate in the bidding which followed. One of those who remained was Ostayan.

Although he heard the auctioneer's disclaimer regarding a senior loan, Ostayan chose to disregard it as "unfounded." In a declaration filed in this matter, he stated, "Since Home Savings was the lender for both the original loan and the additional advance to the original loan, I understood the auctioneer's statement to be to the effect that there might be a senior lien held by a lender other than Home Savings. *Having performed my due diligence and finding that there were no liens of record that were senior to Home Savings, I concluded that the auctioneer's statement of 'belief' as to the existence of a senior lien to be unfounded.*" (Italics added.)

After some spirited bidding between Ostayan and the other two bidders, Ostayan's final bid of $170,400 was successful. He completed the sale by

---

[4]As we point out below, this was an erroneous legal conclusion.

[5]In a declaration filed in this matter, Ostayan stated: "My understanding of an additional advance trust deed was that it was intended to serve as a notice to potential future lenders that the original loan amount had been increased by the additional advance."

[6]This statement was prepared for use by the auctioneer by Dean Gaynor, an assistant vice-president and asset officer of Home. In a declaration, he states that he chose the words "believe" and "believed" because he knew that the auctioneer, a person without actual personal knowledge of the facts regarding the senior lien, would be reading the statement at the sale.

delivering the required sum in the form of cashier's checks. Thereafter, on August 11, 1997, Serrano issued and recorded a trustee's deed conveying to Ostayan the foreclosed interest under the *1988 trust deed*. Because the amount paid by Ostayan exceeded the amount due to Home on its 1988 note by $52,007.23, that amount was paid by Serrano to the United States Small Business Administration which was the beneficiary of a recorded junior trust deed on the property. On September 17, 1997, Home advised Ostayan, as the new owner of the property, that if he did not promptly reinstate the delinquent payments then due on the 1983 note given to Home by the Kurians, Home would foreclose on the 1983 trust deed. Ostayan did not reinstate and Home ultimately completed foreclosure proceedings and sold the property to a third party.

However, before all of these events took place, Ostayan had acted promptly to try and undo the July 28, 1997, trustee's sale. On July 29, one day after his successful bid at the trustee's sale, Ostayan contacted Serrano to confirm the sale. At this time he was informed that Serrano and Home had a different view than he as to what had taken place. During the discussion, Serrano confirmed its position that Ostayan had purchased the trustor's interest in the property *subject to Home's 1983 trust deed.* Ostayan claims he was "shocked" to hear this as he believed that the foreclosure sale had disposed of *all* of Home's trust deed claims. Otherwise, he argues, why should he (and two other bidders) have bid the price up so high.[7]

Ostayan immediately demanded that the sale be canceled and that his bid price be repaid to him. Serrano refused, claiming that the sale was final and, in addition, trustor and junior lienholder rights in any surplus sale proceeds had already vested.

Ostayan then filed this action on July 30, 1997, and sought a temporary restraining order to enjoin conclusion of the sale and dispersal of the proceeds. This was denied, as was his later petition for a preliminary injunction to restrain the foreclosure by Home of its 1983 trust deed. The order denying that injunction was filed on November 20, 1997. Nearly three months earlier Ostayan had filed, on August 12, 1997, his first amended complaint. That pleading was in seven counts and alleged causes of action for (1) fraud, (2) negligent misrepresentation, (3) negligence, (4) setting aside sale, (5) quiet title, (6) declaratory and (7) injunctive relief. Home and Serrano answered and then, on April 24, 1998, filed a motion for summary

---

[7]Unfortunately, the record does not indicate the fair market value of the property on July 28, 1997. Although the nature and content of the parties' arguments suggest otherwise, it is entirely possible that the property had a market value which could have justified a bid of $170,400 to acquire the property even though subject to an outstanding lien of over $200,000.

judgment essentially arguing that the undisputed facts, recited above, demonstrated that neither Home nor Serrano had made any representations on which Ostayan had justifiably relied nor had they owed or breached any duty to him. The cause of his claimed loss was his own legal and/or economic errors for which neither Home nor Serrano could be held responsible. As a result, all of Ostayan's claims must fall. The trial court agreed and granted the summary judgment motion on May 26, 1998. Judgment was entered on July 7, 1998, and Ostayan thereafter prosecuted this timely appeal.

## CONTENTIONS OF THE PARTIES

Ostayan contends that the statement made by the auctioneer regarding his "belief" as to the existence of a senior lien was misleading and was designed to obscure the fact that Home would claim that any sale would be subject to its 1983 trust deed. He also argues that Home at all times treated these two loans as a single obligation, carried them under a single loan number and sent a single bill to the Kurians and thus it should not be allowed to foreclose on these trust deeds separately; in short, there was at least a de facto merger of the two trust deed interests and the foreclosure of one constituted the foreclosure of both. Finally, he argues that Serrano, acting as Home's agent, negligently discharged its duty to prospective bidders by making misleading statements regarding the existence of a senior lien and by failing to state that the property had sustained undisclosed earthquake damage.[8]

Home and Serrano both dispute these contentions and argue, as they did in the trial court, that no misrepresentations were made, there was a fair disclosure of the existing senior lien and any loss sustained by Ostayan was due to his own legal and/or economic misjudgment. They also contend that the principles of merger have no proper application in this case. Thus, Ostayan has no legal basis for complaint and the judgment should be affirmed. We agree with Home and Serrano and will affirm the judgment entered by the trial court.

## DISCUSSION

### 1. *Standard of Review.*

We begin by recognizing that what we review is a summary judgment. Such a judgment may only be granted when no triable issue exists as to any

---

[8]This latter claim appears to have been raised for the first time in Ostayan's reply brief and, in any event, is not supported by any evidence in the record. The only evidence on the subject of which we are aware is a declaration of a Home assistant vice-president stating that Home had the property inspected after the 1994 Northridge earthquake and determined that it had sustained *no* damage. We thus will say no more about this argument.

material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719].) ██ After examining documents supporting a summary judgment motion in the trial court, this court independently determines their effect as a matter of law. (*Hulett v. Farmers Ins. Exchange* (1992) 10 Cal.App.4th 1051, 1057-1058 [12 Cal.Rptr.2d 902].) The moving party bears the burden of establishing, by declarations and evidence, a complete defense to plaintiff's action or the absence of an essential element of plaintiff's case. (*Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1726-1717 [22 Cal.Rptr.2d 781]; Code Civ. Proc., § 437c, subd. (f).) The moving party must demonstrate that under no hypothesis is there a material factual issue requiring a trial. (*Flowmaster, Inc. v. Superior Court* (1993) 16 Cal.App.4th 1019, 1026 [20 Cal.Rptr.2d 666].)

When the moving party makes that showing, the burden of proof shifts to the opposing party to show, by responsive separate statement and admissible evidence, that triable issues of fact exist. (*Lorenzen-Hughes v. MacElhenny, Levy & Co.* (1994) 24 Cal.App.4th 1684 [30 Cal.Rptr.2d 210]; Code Civ. Proc., § 437c, subd. (n)(1).) An issue of fact becomes one of law and loses its "triable" character if the undisputed facts leave no room for a reasonable difference of opinion. (*Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1450 [16 Cal.Rptr.2d 320].)

2. *On the Undisputed Facts, Ostayan Cannot Sustain Any Claim for Intentional or Negligent Misrepresentation or Nondisclosure.*

██ In this case, there clearly is no dispute as to the dispositive facts. Ostayan readily admits that he was aware and in possession of both of the Home trust deeds and the notice of sale as to the 1988 trust deed when he went to the foreclosure sale. The latter document made clear that the only lien being foreclosed was the 1988 trust deed, which was described as instrument No. 88-113619. Thus, Ostayan had to know all that was being foreclosed was a trust deed, which secured an obligation, nearly 10 years old, which was in the original amount of $110,000. In addition, the auctioneer announced (and Ostayan acknowledges that he heard) the foreclosure was subject to a senior lien in excess of $298,000.[9] Yet, he chose to ignore all of that information and assumed that the auctioneer's statement was

---

[9]Home concedes that this was an incorrect figure as it included the total amount due under *both* trust deeds rather than the amount owing under the original 1983 loan and trust deed. However, this simply meant that the amount claimed to be due under the senior lien was too high. Obviously, this error could not logically or reasonably have caused Ostayan to make an excessive bid. If anything, it should have depressed the bidding. Thus, he could not have relied on such announcement to his detriment.

*unfounded.* In making that judgment, he admittedly relied on his own knowledge and experience and the title report that *he* had obtained. Not to put too fine a point on it, Ostayan obviously made his *own* decision to bid $170,400 based entirely on his *own* due diligence investigation. He simply drew the wrong conclusion. His reliance on the title report was also problematic; that report wrongly characterized the 1988 note and trust deed in a way that supported Ostayan's mistaken conclusion. However, that was not the fault of either Home or Serrano.

This record demonstrates that no false, untrue or misleading representation was made to Ostayan by either Home or Serrano; nor was there any nondisclosure of material fact. In any event, by his own admission Ostayan did not rely on anything that the auctioneer stated. His concession in this regard precludes him from establishing the critical element of reliance. Whether it be a cause of action for intentional or negligent misrepresentation, a plaintiff must demonstrate that he or she actually and reasonably relied upon a representation made by the defendant. (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1091-1092 [23 Cal.Rptr.2d 101, 858 P.2d 568].) Ostayan simply cannot do that.

Ostayan's argument in support of his negligence claim is equally without merit. He relies on two cases that hold a foreclosing trustee has a duty to conduct the sale fairly and according to proper procedures so as to achieve the highest possible price. (*Bank of Seoul & Trust Co. v. Marcione* (1988) 198 Cal.App.3d 113, 118 [244 Cal.Rptr. 1] [junior creditor who appeared at sale ready to bid adequately pled breach of the duty by stating that trustee arbitrarily refused to hear its bid]; *Baron v. Colonial Mortgage Service Co.* (1980) 111 Cal.App.3d 316, 323 [168 Cal.Rptr. 450] [trustee arbitrarily refused to consider a bidder qualified].) Ostayan states that if the trustee breaches its duty to the trustor and the beneficiary and thereby injures a bidder as well, the bidder has a cause of action for the breach. (*Baron,* at p. 324.) But he explains neither how the alleged breach in this case caused his alleged damages nor why Serrano owed *him* a duty to provide a more detailed discussion as to the state of record encumbrances when he did not ask for that information. In *Bank of Seoul* and *Baron, unsuccessful* bidders complained of trustees' errors which *depressed* the bidding and sale price of the foreclosed property. In contrast, Ostayan complains that Serrano failed to correct Ostayan's own error, resulting in his becoming the *successful* bidder at an *enhanced* (and grossly excessive) price. We see no reason to allow Ostayan to expand Serrano's existing duty into one which protects bidders from their *own* legal or economic errors. Courts carefully consider whether to permit one person to sue on account of the defendant's alleged breach of a duty owed to another. (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370,

397 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835].) The issue is one of law, and the answer comes from fundamental principles of public policy. (*Id.* at pp. 397-398.) We see no reason to create a new economic tort—that is, a new duty of care from foreclosing trustees to bidders, which requires them to provide sua sponte detailed explanations concerning recorded encumbrances. To do so would frustrate the primary purpose of the foreclosure sale, which is to maximize the price for the beneficiary and trustor. Imposing such a duty of disclosure would encourage trustees to make excessive, self-protective disclosures, thus emphasizing risks and depressing sale prices. In fact, the consequences of creating a new duty highlight why the liabilities of the foreclosing beneficiary and trustee should be limited to deceit (including concealment and misleading statements), warranty (inherent in the trustee's deed), and concealed property defects, as the liabilities of sellers in voluntary sales are similarly limited.

This disposes of Ostayan's first three causes of action as a matter of law and the trial court's ruling with respect to each of those counts was correct. The remaining four counts are necessarily derivative and dependent as they are merely remedies alternative to Ostayan's damage claims. They are each dependent on there being established some wrongful act on the part of Home or Serrano. However, there is no evidence whatever to support such a conclusion. Therefore, the remaining four causes of action fail as well.

3. *There Was No Merger of the 1983 and 1988 Trust Deeds Held by Home.*

Ostayan's merger argument does not help him avoid this result. As we explain, we also reject Ostayan's argument, based on the so-called dragnet clauses in the 1983 trust deed, that there was a merger of the two trust deeds because they shared the same creditor and debtor.[10] Ostayan cites *Union Bank v. Wendland* (1976) 54 Cal.App.3d 393 [126 Cal.Rptr. 549]; however, that case does not support his position. All of the cases which we have found touching on this issue have involved the application of the antideficiency legislation to preclude the creditor from attempting to collect a debt that was found to have been included or merged into a secured obligation that

---

[10]This argument was not really articulated until the reply brief (and then only in a brief and cursory manner), although it was apparently briefed extensively in the trial court in connection with the hearings on Ostayan's unsuccessful efforts to obtain a preliminary injunction restraining Home's foreclosure of the 1983 trust deed. The parties contented themselves with referring us to those trial court arguments. Unfortunately, the parties have not included these materials in the record on appeal. Nonetheless, we have given the parties the opportunity to file post-oral-argument briefs on this issue; they have done so and these supplemental briefs have been received and considered.

had already been foreclosed. (See, e.g., *In re Marriage of Oropallo* (1998) 68 Cal.App.4th 997, 1003-1007 [80 Cal.Rptr.2d 669] and cases cited therein.) The *Union Bank* case is no exception.

In that case, a husband and wife had refinanced their home with a new loan from Union Bank secured by a first trust deed which contained dragnet clauses similar to those utilized here. Subsequently, they made a second unsecured loan from the same creditor. Later still, they made a third loan which was used to pay off the second loan completely and partially pay down the first trust deed loan. This loan was also obtained from Union Bank and was secured by a second trust deed on the same property. After the debtors became delinquent on both obligations, Union Bank nonjudicially foreclosed on its first trust deed. Later, it filed suit to recover the unpaid sums due under the third note, thus attempting to obtain the benefits of a "sold out" junior where a senior lien has been nonjudicially foreclosed. The lead opinion in *Union Bank* held that the debtors were entitled to be protected by Code of Civil Procedure section 580d, which precludes recovery of a deficiency judgment after a nonjudicial foreclosure. That opinion reasoned that the two notes had merged into a single obligation that was secured by the first deed of trust. (*Union Bank v. Wendland, supra,* 54 Cal.App.3d at p. 405.) It explained, however, that such a merger, based on the application of the dragnet clause, really must depend more on the actual expectations of the parties rather than the literal wording of the boilerplate clause. (*Id.* at p. 404.)

However, we see no reason to even get into a discussion of the merger issue. First of all, the so-called dragnet clauses involved here, by their terms, simply have no application. In order for the dragnet clause set out in part 2(a) of the security section of the 1983 trust deed (see fn. 2, *ante*) to apply, a subsequent note must *expressly* recite that it is secured by the 1983 trust deed. That did not occur here. The note secured by the 1988 trust deed contains no such recitation. Indeed, the record makes clear that the parties intended that the later note for $110,000 was to be secured by the *1988 trust deed.* Secondly, the provisions of part 7 of the security section of the 1983 trust deed (see fn. 2, *ante*) expressly state that the inclusion of additional indebtedness under that provision will occur only at the *option* of Home, the exercise of which must be evidenced by *a notice in writing* to the trustor (i.e., the Kurians). No such notice was ever given.

More importantly, any consideration of merger is simply unnecessary. We agree with Justice Elkington's views expressed in his concurring opinion

in *Union Bank.* He observed that California's antideficiency statutes have been given "broad and liberal construction" to effect their purposes. (54 Cal.App.3d 393, 408 (conc. opn. of Elkington, J.) He noted that the application of those statutes does not depend on express or presumptive wrongful conduct by the creditor, and the protection of the statutes cannot be waived, at least at the inception of the credit transaction. (*Ibid.*) Accordingly, he expressed the opinion that neither waiver nor intent was relevant to whether the claim to be a sold out junior lienor violated Code of Civil Procedure section 580d. (54 Cal.App.3d at p. 408 (conc. opn. of Elkington, J.).) Thus, his agreement with the result in *Union Bank* rested upon the proposition that a beneficiary would frustrate the purpose of section 580d if it could realize on its security nonjudicially by first foreclosing the senior deed of trust and then suing for money under the note formerly secured by the junior deed of trust. (54 Cal.App.3d at p. 409 (conc. opn. of Elkington, J.).) We agree with this analysis and believe it is entirely dispositive of Ostayan's contentions regarding the application of merger *in this matter.* Subsequently, the court in *Simon v. Superior Court* (1992) 4 Cal.App.4th 63 [5 Cal.Rptr.2d 428] adopted this view of the proper way to resolve the issue.

Unlike a true third party sold out junior lienholder (Union Bank's second trust deed was extinguished by the foreclosure of its own first trust deed), Union Bank's right to recover on its junior note was not controlled by the whim of a senior lienholder; it was Union Bank's own choice to proceed by nonjudicial foreclosure of the senior lien which it also owned. (See *Simon v. Superior Court, supra,* 4 Cal.App.4th at p. 77.) In other words, a creditor holding two successive trust deed liens cannot properly characterize itself a sold out junior lienholder by foreclosing on the senior lien. (*Id.* at p. 77-78.) To hold otherwise would frustrate the fundamental public policy underlying Code of Civil Procedure section 580d. (4 Cal.App.4th at pp. 77-78.)

In this case, we do not have a creditor seeking to avoid the reach of the antideficiency legislation. Home simply foreclosed on its junior lien with full disclosure to all. No deficiency judgment was sought, nor does such a result effectively flow. The successful bidder, Ostayan, had every right, as purchaser, to assume the senior lien and go forward as owner of the property. Had Ostayan not made a legal error and made an excessive bid he would have had every economic incentive to step into the Kurians' shoes and protect his interests by assuming the 1983 trust deed obligation. As we have pointed out, his excessive bid was prompted not by any act or omission of Home or Serrano, but rather by his own legal miscalculation, which caused him to conclude that he was purchasing foreclosed trust deed obligations of approximately $300,000 for a nearly 50 percent discount.

## DISPOSITION

The judgment is affirmed. Serrano and Home shall recover their costs on appeal.

Kitching, J., and Schneider, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied May 24, 2000.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.